JUDGE CARTER                              14 CV 3305

REID COLLINS & TSAI LLP
Jeffrey E. Gross (JG 5200)
Anne M. Bahr (AB 1002)
One Penn Plaza, 49th Floor
New York, New York 10119
(212) 344-5200
*Attorneys for Plaintiff*

RECEIVED
MAY -7 2014
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

BROOKHOLLOW V, LTD.,

                    Plaintiff,

     -against-

SAM ADAMS, and
ROBERT RICCIARDELLI,

                    Defendants.

-----------------------------------------------------------------x

Case No. _____

**ECF CASE**

**Original Complaint**

     Plaintiff Brookhollow V, Ltd., by its attorneys Reid Collins & Tsai LLP, brings this action against Samuel Adams and Robert Ricciardelli (collectively, the "**Defendants**"), and respectfully alleges as follows:

## NATURE OF THE ACTION

     1.     This is a fraud claim against two former hedge fund managers. In approximately August of 2006, Defendants formed the "Cedar Lane" group of funds, which they styled as an entertainment-industry hedge fund. By March 2010 the Cedar Lane funds were in liquidation proceedings in the Grand Court of the Cayman Islands. Defendants' personal fraudulent actions against the Cedar Lane fund itself in connection with one particular investment before the funds collapsed are the basis of this complaint.

2. That investment was a $9 million loan to Vincent Dymon's ("**Dymon**") company Jury Duty LLC. Although Dymon had no experience in the entertainment industry, Defendants caused Cedar Lane to loan him millions of dollars to fund a new television show called Jury Duty. The decision to make the loan was preferential, going against the strong recommendation of the third party consultant hired to evaluate Jury Duty's prospects, which predicted a nearly $6 million deficit in the show's first season. That prediction proved substantially accurate, the show was cancelled, and the loan went into default on the first payment.

3. Writing off the loan as a loss would have required Defendants to admit a mistake and reduce the management fee charged by their jointly owned investment management company. Instead, Defendants pretended to believe Dymon's story that a mafia don had bequeathed him $40 million, and that he would repay the loan as soon as he received his inheritance. Pretending to expect repayment from this imaginary trust fund, which they did nothing to verify, Defendants continued valuing the loan at 100 percent of face value, and collecting management fees on that basis, until the Cedar Lane funds went into liquidation in March 2010.

4. Defendants' deception did not stop at simply acquiescing to a story they knew to be false, or inflating their management fees. They also drafted phony documents for Dymon to sign in an effort to formalize his tall tale and pass it off on Cedar Lane and its investors. With these documents in hand, Defendants proceeded to *increase* the loan amount from $9 million to $15 million, even though the television show had already failed and the borrower had no legitimate need for the additional $6 million. Virtually all of that $6 million went directly to bank accounts Defendants controlled. Defendants told the borrower (Dymon) that the $6 million was to cover interest payments, marketing expenses, and legal fees, but in reality they just took the money and applied it to their own ends, let Jury Duty LLC go into default, stuck Cedar Lane with the losses,

and walked away as their hedge fund collapsed—a wilful and egregious fraud on the fund and its investors.

5.  As a result of Defendants' actions, Cedar Lane suffered millions of dollars in losses, including a total loss on the full amount of the loan to Jury Duty LLC, $15 million.

## THE PARTIES

*Defendants*

6.  Defendant Samuel Adams is an individual currently residing at 39 Pleasant Hill Road, Freeport, Maine.

7.  Defendant Robert Ricciardelli is an individual currently residing at 509 West Gainsborough Road No. 306, Thousand Oaks, California.

*Plaintiff*

8.  Plaintiff, Brookhollow V, Ltd., is a Cayman Islands company formed under the Companies Law of the Cayman Islands. It maintains its registered office in Grand Cayman and its sole director is domiciled in the Cayman Islands.

9.  Cedar Lane Entertainment Fund, Ltd., which suffered the losses described herein, and RW Services, Ltd., which originated the loan that is the basis of this complaint, are in official liquidation in the Grand Court of the Cayman Islands. On May 11, 2012, the Grand Court entered an order authorizing the Joint Official Liquidators of the Cedar Lane funds to assign all of the causes of action belonging to Cedar Lane Entertainment Fund, Ltd. and RW Services Ltd. to the Plaintiff. Accordingly, the Joint Official Liquidators executed the necessary deeds of assignment in April and May of 2012.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over Defendants pursuant to 28 U.S.C. § 1332(a)(2) because Defendants are citizens of different states and the Plaintiff is a citizen of a foreign state and the amount in controversy exceeds $75,000.

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to this claim occurred within this judicial district.

## FACTS

*The Structure of the Cedar Lane Funds*

12.     Defendants formed the "**Cedar Lane**" group of funds in approximately August of 2006. Contractually, Defendants were employees of Cedar Lane Asset Management LLC (the "**Investment Manager**") a Delaware limited liability company. The Investment Manager maintained its office in New York, New York. At all times relevant to this Complaint, the Master Fund had at least one independent director in Grand Cayman.

13.     Investors from the United States and overseas invested in Cedar Lane by purchasing equity interests in Cedar Lane Entertainment Fund, Ltd. (the "**Master Fund**"). The Master Fund owned virtually all of Cedar Lane's financial assets, primarily high-interest loans to entertainment industry borrowers.

14.     Each of these loans was structured in the same way. First, Defendants caused an "orphan" issuer to be formed. The issuer was typically a Cayman Islands trust with an unrelated charity for a beneficiary. The issuer originated and funded the loan to the borrower, but, on the same day, the Master Fund purchased a 100 percent participation in the loan for face value. This resulted in the Master Fund assuming all of the economic risk and reward of the loan, as if the Master Fund itself had been the issuer.

***The April 2007 Loan to Jury Duty LLC***

15. Defendants made one such loan to a company that belonged to one of Defendant Ricciardelli's friends named Vincent Dymon. Dymon, a former casino manager, had no experience in the entertainment industry but conceived of a television show called "Jury Duty" in which celebrity jurors debated civil cases for an audience. In roughly November of 2006, Dymon met with Defendants about funding the show with a loan from Cedar Lane.

16. Before agreeing to make the loan, Defendants hired a company called October Moon Consulting to evaluate Jury Duty's prospects. (Defendants did so because the Investment Advisor was contractually obligated to obtain third party appraisals of prospective investments.) October Moon's analysis was thorough, evidence-based, and decidedly negative. It predicted a deficit of $5.8 million in the first season of the show and recommended against funding it.

17. October Moon's fifteen-page report concluded by apologizing to Defendants that "we were not able to provide the positive report you hoped to achieve." That was on April 2, 2007. Ricciardelli then tried to have October Moon take a second look at Jury Duty and, nine days later, October Moon wrote a supplemental report. In the supplemental report, October Moon acknowledged the receipt of some additional materials but wrote that "[r]eviewing the new information provided did not change any of the projections on ratings or revenue contained in our original report," and reiterated its estimate of a $5.8 million deficit in the first season.

18. Defendants caused Cedar Lane to fund the show anyway. To justify the decision in the face of the negative October Moon Reports, Defendants cooked up an "in-house" analysis that made more positive projections.

19. The Cayman Islands entity that Defendants used to originate the Loan was called RW Services Ltd. (the "**Lender**"). Pursuant to an April 30, 2007 Credit Facility Agreement the Lender extended a $9 million loan to Jury Duty LLC (the "**Jury Duty Loan**" or the "**Loan**"). On the same day, the Master Fund purchased a 100 percent participation at face value, assuming all of the risk and reward of the Loan.

20. Dymon personally guaranteed the Loan up to $1 million. His wife (collectively with Dymon, the "**Dymons**") personally guaranteed it up to $2.5 million. The Dymons' company, Radar Entertainment LLC, was a credit party and a guarantor as well. The Loan was "secured" by all of the assets of Jury Duty LLC and Radar Entertainment LLC, which consisted of little more than furniture, props, and the intellectual property rights to the show.

21. October Moon's negative predictions soon proved accurate. Jury Duty was not a success and only aired one season. Advertising revenue was negligible, and Jury Duty LLC never made a single payment on the Loan. Yet Defendants did not move to enforce the guarantees against the Dymons or Radar Entertainment LLC, or to seize the collateral for what it was worth. Instead, Defendants *increased* the amount of the Loan by $6 million, doubling down with the Master Fund's money.

*Ten Successive Loan Increases Deepen Losses*

22. Between August 21, 2007 and December 2, 2008, Defendants increased the Loan from $9 million to $15 million through a series of amendments to the original Credit Facility Agreement. At the time of each amendment, Defendants caused the Lender to waive all existing defaults and to increase the Loan's principal amount by several hundred thousand to more than a million dollars. There were ten successive amendments increasing the amount of the Loan before it went into final default.

23.     To understand why Defendants would put up another $6 million of the Master Fund's money after Jury Duty had already failed, it is necessary to understand Defendants' contractual incentives as owners of the Investment Manager.

24.     Pursuant to the Investment Management Agreement, the Master Fund paid the Investment Manager a management fee and a performance fee, which in turn flowed to Defendants. The performance fee was twenty percent of the Master Fund's annual increase. The management fee was two percent of the Master Fund's total assets under management.

25.     The show failed as the independent consultant predicted so there was never any prospect of a performance fee. But the two-percent management fee gave Defendants an incentive to postpone writing off the Jury Duty Loan for as long as possible. A far-fetched story from Dymon gave Defendants the excuse they needed to continue appraising the Loan at face value.

26.     Dymon describes a now-deceased organized crime figure named Hymen Larner as his "surrogate father." In roughly November of 2006, Dymon told Adams and Ricciardelli that Larner had left him a $40 million trust fund located in bank accounts in Panama, Switzerland, and the Cayman Islands. Dymon claimed that he was receiving annual interest income of $200,000 from the trust fund, and that he would receive the full $40 million corpus on his fortieth birthday, February 27, 2010 (the "**Distribution Date**"). Dymon may have told this story to bolster his chances of securing a loan from Cedar Lane, but Adams and Ricciardelli have now both testified under oath that they did not rely on the existence of the trust in originally making the Loan.

27.     According to Defendants, the purpose of loaning more money after Jury Duty had failed was to keep the Loan out of default status. The increases in the Loan were partly applied to accrued and outstanding interest. In this way, Defendants claim, they hoped to keep the Loan afloat until the Distribution Date, at which time Dymon would repay the entire $15 million.

28. But Defendants never truly believed in existence of Dymon's trust fund. They only pretended to believe in it because pretending to expect repayment in full allowed them to continue valuing the Loan at par and collecting significant management fees on that basis. Without the trust fund story to fall back on, Defendants would have had to admit to a mistake and write off the Jury Duty Loan, cutting their management fee by some $300,000 per year for two years.

***Defendants Prepare Phony Documents to Corroborate the Fictitious Trust***

29. Dymon had nothing to prove the trust existed—no witnesses and no documents. But because they were only concerned with duping the Master Fund, Defendants took no steps to investigate Dymon's claims, which would have quickly proved their falsity. They did not ask the Dymons for a tax return or bank records to prove the supposed annual receipt of $200,000 interest income. They did not try to locate the estate of Hymen Larner. Nor did they attempt to contact the lawyer who supposedly administered the trust. "I personally Googled Hymen Learner [*sic*]," was the only diligence Adams was able to specify when asked about this under oath.

30. Instead, Defendants set about creating bogus documents to help Dymon corroborate his unlikely story. Ricciardelli had his old college roommate—a lawyer in Chicago—prepare a certain "Declaration" for Dymon's signature. According to the Declaration, Dymon was the beneficiary of the "Red Waterfall Abba Trust," which had $40 million located in bank accounts in the Cayman Islands, Panama, and Switzerland. According to the Declaration (but contrary to both Defendants' testimony), Dymon induced the original Jury Duty Loan by guaranteeing it in full out of the proceeds of the trust on the Distribution Date. Ricciardelli went to Dymon and had him sign the Declaration under penalty of perjury on April 10, 2008.

31. Dymon originally told the story about the trust to bolster his chances of getting a loan from Cedar Lane. Under oath in 2014, Dymon testified that Ricciardelli pressured him for

hours to sign the Declaration, and that he (Dymon) backed off of his earlier claims and repeatedly cautioned Ricciardelli that he had no documentation to prove the trust existed and that he was unsure whether in fact it did. Ricciardelli strong-armed him into signing it anyway, telling him it was only for the benefit of Cedar Lane's investors. According to his sworn testimony, Dymon asked that his lawyer be allowed to review the Declaration but Ricciardelli's "exact words" were: "There's no way your attorney will let you sign this and I need this for our investors or Cedar Lane is going to go out of business."

32. Next, Defendants drafted a "Letter of Direction" to "James Contis, Esq." of the law firm Slavin & Slavin in Chicago. Contis was supposedly the trustee of the Red Waterfall Abba Trust. The Letter of Direction, which Dymon signed, instructed Contis to wire $20 million to the Master Fund on the Distribution Date. But in reality, there is no James Contis licensed with the Illinois bar. There is a personal injury firm in Chicago called Slavin & Slavin, but they have never heard of any James Contis. And the Letter of Direction was never sent to anyone. It was only meant to paper the Jury Duty file in order to deceive the Master Fund and its investors.

33. Having created the Declaration and the Letter of Direction, and with the supposed assurance of recovery out of the Red Waterfall Abba Trust, Defendants caused the Master Fund to enter into the last five amendments to the April 30, 2007 Credit Facility Agreement, which collectively increased the amount of the Loan by more than $2 million. Defendants Adams and Ricciardelli have both testified that Dymon's guarantee of repayment from the Red Waterfall Abba Trust justified causing the Master Fund to make those additional loan advances.

34. As planned, Defendants went on to deliberately deceive the Master Fund regarding the prospect of repayment from the Red Waterfall Abba Trust. In "Transaction Updates" dated July and November 2009, Defendants represented to the Master Fund and its investors that "the

9

principal *and* interest" of the Loan "*will be repaid* from the proceeds of [Dymon's] personal trust at its maturity in April 2010. ... As such, *we recommend that no reserve be taken* on this credit at the present time." The Transaction Updates further assured the Master Fund and its investors that "[w]e continue to monitor the status of the trust in the interim and are assisting the principal in setting up an offshore entity to avoid the tax consequences of patriating the trust proceeds prior to the loan repayment." But according to Dymon's sworn testimony, Defendants conducted no monitoring and never spoke to him about the tax consequences of patriating money from overseas. After getting him to sign the Declaration and the Letter of Direction, Defendants never again mentioned the trust to Dymon.

35. Additionally, Defendants distributed a "Cash Collection Projection" on May 22, 2010 showing full repayment of the Loan in a lump sum of $15 million in March 2010—the first month after the supposed Distribution Date. Defendants continued valuing the Jury Duty Loan at $15 million right up until the Master Fund entered liquidation proceedings in March of 2010.

**None of the $6 Million Disbursed Under the Ten Amendments Went to Legitimate Ends**

36. With the Master Fund deteriorating along with the global economy, Defendants hastened to line their pockets as much as possible. On each of the ten amendments to the original Credit Facility Agreement, the Investment Advisor collected substantial fees that were supposedly for "diligence" or "monitoring" or the like, even though production was over, the show had failed, and there was nothing to investigate or monitor. Importantly, these fees flowed to Defendants personally, not to the Lender, even though the Lender was the entity waiving its rights and increasing its risk under each amendment.

37. Defendants charged the Master Fund a total of $343,933 for redundant or nonexistent services in connection with the ten amendments. Pursuant to the third amendment,

Defendants caused the Master Fund to pay an additional $285,507 to Winged Victory Films LLC, a company that had managed production during the first season of the show. But by this time (January 10, 2008), Winged Victory's work had come to an end.

38. Indeed, production on the show ended in August 2007, before the first amendment. According to Dymon, neither he nor his wife nor anyone else actually involved in working on the television show ever received any money from the ten successive amendments. All $6 million went to accounts under Defendants' exclusive control. Defendants told Dymon the $6 million was for various "marketing" expenses, but he never saw more than one or two billboards as a product of those efforts. Defendants also told Dymon the $6 million was used to keep the Jury Duty Loan afloat by making payments as they came due. But when Cedar Lane went into liquidation, its books showed no principal payment on the Loan had ever been made. While some of the $6 million might have been applied to interest payments, and some of it might have gone to legal fees, that still leaves at least $5 million completely unaccounted for.

39. On information and belief, Defendants simply stole the money. Then they watched Jury Duty LLC default on the Loan, took no action to collect, stuck the Master Fund with the losses, and walked away from Cedar Lane as it went into liquidation.

## FIRST CAUSE OF ACTION:  FRAUD

40. Plaintiff incorporates by reference all of the allegations above.

41. By drafting and causing Dymon to sign the Declaration on or about April 10, 2008, and communicating that document to the Master Fund shortly thereafter, Defendants represented to the Lender and the Master Fund that Dymon was presently the beneficiary of a certain $40 million Red Waterfall Abba Trust. At the same time, Defendants represented to the Lender and the Master Fund that they had investigated and confirmed the existence of the trust; they also